UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

AMERICAN HONDA MOTOR CO., INC., a
foreign corporation,

Plaintiff,

v.                                                              Case No.  5:04-cv-12-Oc-10GRJ

MOTORCYCLE INFORMATION NETWORK,
INC., a Florida corporation, GREGORY S.
SCHWEIGHART,

Defendants.
_____

## REPORT AND RECOMMENDATION[1]

Pending before the Court is Plaintiff, American Honda Motor Co., Inc.'s

Dispositive Motion For Summary Judgment. (Doc. 78.)  Plaintiff filed a memorandum

(Doc. 82) and appendix (Doc. 83) in support of its motion.  Defendants have filed a

response (Doc. 100) and supporting appendix (Doc. 101)[2] and, therefore, Plaintiff's

motion is ripe for review. For the reasons discussed below, American Honda's

Dispositive Motion For Summary Judgment is due to be **GRANTED**.

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

[2] In their appendix, Defendants note that they will file relevant excerpts of Kelly Kneivel's deposition once they receive the transcripts. To date, they have filed no such excerpts. Additionally, Defendants' appendix identifies "Exhibits to the deposition of Gregory Schweighart Volume I." However, the exhibits have not been filed with the Court.  Moreover, while American Honda filed the original transcript of Gregory Schweighart's deposition, the exhibits were not filed.

## I. **FACTS AND BACKGROUND**

The Plaintiff is American Honda Motor Company, Inc. ("American Honda"), a

California corporation and global manufacturer and seller of motorcycles, automobiles,

and other motorized vehicles.  The Defendants are Motorcycle Information Network, Inc.

("MIN"), a Florida corporation, and its principal, Gregory S. Schweighart, a resident of

Florida.[3]

This case involves an idea for a telematics system for motorcycles allegedly

conceived by Schweighart. This compilation of ideas[4] -  which has never been reduced

to practice - is described by Schweighart as "a telematics system[5] for motorcycle riders,

including 14 million points of interest, a mapping program, a telematic environment of

Location Based Services, a tracking element through the use of GPS technology, a

memory program which logs and records the rider/driver's routes, a web portal over the

internet where the individual rider/driver could program their preferences in multiple

categories in the set up process, and a mechanism for the manufacturer, or any third

party vendor or agent to advertise new products or services."[6] Schweighart, who only

has a GED, does not have any formal training in any related technology.  The only

element of Shweighart's compilation of ideas that needed to be developed from

---

[3] Jurisdiction is based on diversity of citizenship.  *See* 28 U.S.C. §1332.

[4] At a hearing on October 7, 2004, MIN stipulated on the record that it wished to assert property rights over "a compilation of ideas" and that the case involves the use or misuse of trade secrets, and not patents, copyrights or trademarks.  <u>See</u> Doc. 57 at 5-8

[5] "Telematics" refers to the combination of telecommunications and computing or data communications between systems and devices.  *See, e.g.*, Free On-Line Dictionary of Computing, available at www.foldoc.org.

[6] <u>See</u> Doc. 83 , Exhibit 12 (Defendants/Counter-Plaintiffs' Notice of Service and Supplemental Answers to Plaintiff/Counter-Defendant's First Set of Interrogatories), Answer to Interrogatory  2.

"scratch" was the mapping program; the other elements were available in the marketplace.[7]

According to American Honda's experts, as of October 2000, Schweighart's telematics system, as a whole, was not novel or unique in the field of vehicle navigation technology.[8]  Indeed, the ideas, separately and together, had been published by a variety of researchers, engineers, and equipment manufacturers in a broad array of sources including newspapers, popular magazines, trade journals, trade conference proceedings, peer-reviewed articles, and patent applications and published patents prior to January of 2000.[9] Defendants did not submit any expert reports or other evidence challenging this testimony or any evidence suggesting that its compilation of ideas was unique.

Before Schweighart's first contact with American Honda, he asserts that he discussed his compilation of ideas with Evel Knievel and his business organization. According to Schweighart, Knievel made a non-binding offer to provide full funding

_____

[7] See id., Answer to Interrogatory 5. MIN also developed a paper version of the system that incorporated maps and points of interest containing over 14 million businesses and various categories of information and databases which were customizable to the lifestyle specific to each map user and which could be separately marketed and sold to consumers, such as motorcycle riders.  See Doc. 50 ¶18; Schweighart Deposition, pages 55-56, 60-62.  However, before he had any contact with American Honda, MIN decided to forego the implementation of the paper map system because it would distract it from the development of its digital based system and might further tip off those in the industry to develop a digital based system. See Schweighart Deposition, pages 59-60, 825:5-826:18.

[8] See Doc. 83, Exhibits 13 (Expert Witness Report by Peter H. Dana, Ph.D) & 14(Technical Evaluation of Navigation and Information System Concepts Proposed by Motorcycle Information Network, Inc. by Robert L. French). MIN did not submit any expert reports to refute American Honda's experts.

[9] See Dana Report, pages 43-44; French Report, pages 19-41.

(approximately $7 million) for the development of the mapping program,[10] under an arrangement in which Knievel was going to act as a broker and another entity would actually provide the venture capital.[11] MIN decided, however, that it did not want to do business with Knievel and that it did not want to incur the burden of repaying nearly $70 million to Knievel's investors for a mere $7 million initial investment.[12]

The first contact with American Honda began in October 2000, when Schweighart approached American Honda to see if American Honda would be interested in sponsoring or funding the development of the mapping program.[13]  Over the course of the next twelve months, Schweighart had five fairly brief meetings with representatives of American Honda, four of which occurred at public events such as Biketoberfest, Bike Week and the Honda Homecoming.

Schweighart was first introduced to American Honda representatives at an industry-wide motorcycle conference in October 2000 in California.[14]  He had an impromptu conversation with Gary Christopher and Wayne Toyota in the hallway of the conference hotel, adjacent to the restrooms during a break between speakers.[15]

---

[10] See Schweighart Deposition, pages 109 -116; Doc. 83, Tab 23, (Declaration of Gregory Schweighart), ¶¶4,5.

[11] See Schweighart Deposition, page 114.

[12] See id., pages 114, 868.  Apparently, Knievel's funding offer is still available, contingent upon MIN demonstrating the viability of its telematics system. See Declaration of Gregory Schweighart,¶6; Schweighart Deposition, 848-51.

[13] See Defendants/Counter-Plaintiffs' Notice of Service and Supplemental Answers to Plaintiff/Counter-Defendant's First Set of Interrogatories, Answer to Interrogatories 19 & 21.

[14] See Schweighart Deposition, page 159.

[15] See Schweighart Deposition, pages 159, 170.

Christopher was the Senior Manager of American Honda's Motorcycle Sports and Press Department.[16]   Toyota was the Senior Manager of American Honda's Motorcycle Advertising.[17]  Notably, neither Christopher nor Toyota had any role at American Honda in relevant product development or improvement at any time relevant to this action.[18]

Schweighart talked with Christopher and Toyota for about twenty or twenty-five minutes during this first meeting[19] during which Schweighart described the telematics system in general terms but did not discuss the specifics of the product with enough detail to demonstrate the exact combination of elements.[20]  Schweighart did not provide Toyota and Christopher with any written materials at this meeting except for a non-disclosure agreement, that they declined to sign.[21]   As a result of this meeting, Toyota and Christopher referred Schweighart to Charles Keller, who was the Manager of Honda Rider's Club of America.[22]  Other than referring Schweighart to Keller, Toyota and Christopher did not share any information that they learned from Schweighart with

---

[16] See Doc. 83, Exhibit 6 (Declaration of Gary Christopher), ¶2.  Christopher's responsibilities include internal and external communications and media relations for American Honda's Motorcycle Division and managerial oversight of the Division's professional racing teams, including motocross, Supercross and road racing.  See id.

[17] See Doc. 83, Exhibit 4 (Declaration of Wayne Toyota), ¶2.

[18] See Declaration of Gary Christopher, ¶2; Declaration of Wayne Toyota, ¶2.

[19] See id., page 162.

[20] See Defendants/Counter-Plaintiffs' Notice of Service and Supplemental Answers to Plaintiff/Counter-Defendant's First Set of Interrogatories, Answer to Interrogatories 19 & 21.

[21] See Schweighart Deposition, pages 164, 183.

[22] See Schweighart Deposition, page 164; Declaration of Wayne Toyota, ¶3.  Honda Rider's Club of America is an American Honda/Motorcycle Division program for Honda motorcycle, ATV, and scooter owners designed to make the most of their ownership experience.  See Doc. 83, Exhibit 5 (American Honda Motor Co., Inc.'s Objections and Responses to Defendants' First Set Of Interrogatories), Answer to Interrogatory 23.

anyone at Honda Research and Development in Japan or American Honda.[23]

Schweighart contends that Toyota and Christopher told him that if Schweighart ended

his dealings with Evel Knievel, they would make a minimum of $7 million available for

the development of the telematics system and would allow Schweighart access to

American Honda's customer base.[24]  There is no written documentation in the record

memorializing this alleged offer for funding.[25]

A few weeks later, Schweighart met with Charles Keller during Biketoberfest in

Daytona Beach, Florida.[26]  They met on a Sunday morning at 6:00 a.m. under the

American Honda tent in the front convention area of Daytona International Speedway.[27]

The meeting lasted for a couple of hours.[28]  During the meeting Schweighart asked

Keller to sign a non-disclosure agreement but Keller refused to sign it.[29]  At that

meeting, Schweighart also gave Keller a document that Schweighart described as

"paper collateral for a brochure."[30] However, the "paper collateral" did not contain any

---

[23] See Declaration of Wayne Toyota, ¶3; Declaration of Gary Christopher, ¶3.

[24] See Schweighart Deposition, pages 175-76.

[25] See id., pages 178-80.

[26] See id., page 183.

[27] See id., pages 184-85.  Schweighart attempted to meet with Keller on Wednesday morning.  He walked up to Keller and said "I'm Greg Schweighart.  I was instructed by Wayne Toyota and Gary Christopher to come here to meet you when I was in California last week."  However, Keller did not have time to meet with Schweighart and told him that the only time he could meet was Sunday morning at 6:00 a.m.

[28] See id., page 185.

[29] See id., pages 186-87.

[30] See id., pages 101-02, 185.  This document was identified as Exhibit 10 to Schweighart's Deposition.  However, as noted above in footnote 2, the exhibits were not filed with the Court.

confidential, proprietary or privileged information.[31]  Schweighart also gave Keller a CD-ROM containing a "shell application" that "demonstrat[ed] intent" and was not fully functional.[32] According to Schweighart, Keller requested that Schweighart research whether a command center (similar to On-Star) could be incorporated into the system to "watch over" American Honda's motorcycle riders.[33]

Schweighart also testified that he had several telephone and email communications with Keller after the meeting at Biketoberfest to update Schweighart regarding the command center.[34]  However, his next face-to-face meeting with Keller did not occur until Bike Week in March of 2001.[35]  Schweighart saw Keller several times during Bike Week but they only discussed business during one meeting that lasted a couple of hours.[36]  Although Schweighart did not provide Keller with any documents at that meeting he did provide him with another copy of a CD-ROM containing another version of the software.[37] According to Schweighart, at that second meeting Keller

---

[31] See id., page 104.

[32] See id., pages 73-74.

[33] See id., pages 189-90.

[34] See id..

[35] See id., page 192.

[36] See id., pages 192-93.

[37] See id., pages 194-95.  Schweighart testified that he assumed he gave Keller software version 2.0 at this meeting.  See id.  Schweighart believes that version 2.0 had the mapping component disabled. See id., page 458.  There is another version of the software titled "MIN Final", however, Schweighart did not provide a copy of this final version to Keller.  See id., page 459.

asked him to investigate whether a wireless network could be integrated into the system to track and monitor American Honda's motorcycle riders.[38]

In July 2001, Schweighart sent email messages to Keller to schedule a meeting at one of American Honda's upcoming public events.[39]  In late July 2001, Schweighart met with Keller during the Honda Homecoming in Marysville, Ohio.[40]  The meeting, which took place in the parking lot of American Honda's manufacturing plant, lasted only ten or fifteen minutes.[41]   Schweighart did not discuss any substantive matters with Keller at this brief meeting other than telling Keller what he had learned about wireless networks.[42]  As was the case at the previous meeting, Schweighart did not provide Keller with any documents.[43]

Finally, on October 2, 2001, Schweighart met with Keller at Honda Headquarters in Torrance, California.[44]  The meeting lasted two to two and a half hours.[45]  During the course of the meeting, Schweighart provided Keller with a black spiral marketing book, transparencies, a CD of his software and showed him a sample PDA and GPS cradle

---

[38] See id., pages 24-25, 193-94.

[39] See Doc. 83, Exhibits 9 & 22 (email communications); Schweighart Deposition, page 198.

[40] See Schweighart Deposition, pages 196, 198-99.

[41] See id., pages 198-99, 201.

[42] See id., pages 199-200.

[43] See id., page 201.

[44] See id., page 202.

[45] See id.

8

that could be utilized in the telematics system.[46]  After the meeting, Schweighart

returned home to Florida and waited to hear from American Honda.[47]

Keller promptly forwarded Schweighart/MIN's proposal and unsigned

confidentiality agreement to William R. Willen, Managing Counsel for the Product

Regulatory (Legal) Office of American Honda (hereinafter "Legal Office").[48]  Otherwise,

Mr. Keller did not share or divulge any information regarding his meeting with Mr.

Schweighart (or any other meeting) with anyone at Honda Research and Development

in Japan or any other American Honda employee.[49]

Based on its review of Schweighart/MIN's proposal, the Legal Office concluded

that the proposal was nothing more than a general business plan for a telematics

concept with both a marketing and a product component.[50]  The materials remained in

the Legal Office and were not passed to, viewed, or discussed with Honda Research

and Development in Japan or upper management of American Honda.[51] The non-

disclosure agreement was never executed by anyone.

At the end of October (less than one month after Schweighert's meeting at

Honda Headquarters) the Legal Office sent Schweighart a letter formally advising him

---

[46] See id., pages 205-08.

[47] See id., pages 913-14.

[48] See Doc. 83, Exhibit 7 (Declaration of Charles Keller), ¶7.

[49] See Declaration of Charles Keller, ¶¶7-8.

[50] See id.,¶4.

[51] See id., ¶6.

that Honda was not interested in pursuing his proposal.[52]  The letter recited that the

legal department was responding because "communications to business departments in

the company about unsolicited ideas are customarily referred to legal counsel."  The

letter further recited that American Honda does not use unsolicited marketing ideas

because American Honda has chosen to rely exclusively on internal resources for its

business needs in this area.  In addition, Honda advised Schweighart in the letter that

with respect to the product component of the idea, American Honda requires

presentation of a full U.S. patent.  Schweighart testified that upon receiving the letter he

understood that any relationship he and MIN had with American Honda was over.[53]

Two years later, on December 15, 2003, Schweighart sent a demand letter to

American Honda demanding unspecified relief and threatening legal action. Enclosed

with the demand letter was a  draft complaint alleging, *inter alia*, claims for theft of trade

secrets, breach of confidential relationship and fraud.[54]  This prompted American Honda

to file suit in this Court several weeks later, seeking a declaration that American Honda

was not infringing any intellectual property rights held by the Defendants.  (Doc. 1.)

The Defendants answered and Defendant MIN filed a counterclaim (Doc. 19),

which was subsequently amended. (Doc. 50).  The First Amended Counterclaim was

framed in seven counts: (1) theft of trade secrets, in violation of Florida's Uniform Trade

Secrets Act; (2) deceptive and unfair trade practices in violation of Florida's Deceptive

and Unfair Trade Practices Act, §§501.201, et seq. ("FDUTPA"); (3) breach of oral

---

[52] See Doc. 83, Exhibit 21; Declaration of William R. Willen, ¶4; Schweighart Deposition, page 210.

[53] See Schweighart Deposition, page 913.

[54] See Doc. 13, Exhibit A.

confidentiality agreement; (4) breach of contract implied in law/quasi contract; (5) fraud;

(6) negligent misrepresentation; and (7) constructive fraud.  The Court dismissed Count

Four (breach of contract implied in law/quasi contract) and Count Seven (constructive

fraud) with prejudice (Doc. 64) and MIN voluntarily dismissed Count One (theft of trade

secrets, in violation of Florida's Uniform Trade Secrets Act) with prejudice. (Doc. 65.)

American Honda now moves for summary judgment both on its Complaint for

Declaratory Judgment and on the remaining counts of MIN's First Amended

Counterclaim.

## II.  **SUMMARY JUDGMENT STANDARD**

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary

judgment is appropriate only when the Court is satisfied that "there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  In applying this standard, the Court must examine the pleadings, depositions,

answers to interrogatories, and admissions on file, together with any affidavits and other

evidence in the record "in the light most favorable to the nonmoving party.[55]  As the

Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party

bears the initial burden of establishing the nonexistence of a triable issue of fact.   If the

movant is successful on this score, the burden of production shifts to the non-moving

party who must then come forward with "sufficient evidence of every element that he or

she must prove."[56]  The non-moving party may not simply rest on the pleadings, but

---

[55] See Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).

[56] Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).

must use affidavits, depositions, answers to interrogatories, or other admissible

evidence to demonstrate that a material fact issue remains to be tried.

## III.  DISCUSSION

**A.**     **American Honda's Complaint For Declaratory Judgment**

American Honda argues that the Court should enter summary judgment in its

favor on its Complaint for Declaratory Judgment because Defendants have given up

any right to assert that American Honda misappropriated any intellectual property rights

belonging to MIN or Schweighart.  Defendants do not address this argument in their

memorandum nor do they even mention American Honda's Complaint for Declaratory

Relief.

At a hearing on October 7, 2004, MIN stipulated on the record that it wished to

assert property rights over "a compilation of ideas" and that the case involves the use or

misuse of trade secrets, and not patents, copyrights or trademarks.[57]  On June 21,

2005, MIN voluntarily dismissed with prejudice Count One of the First Amended

Counterclaim, which asserted a claim for theft of trade secrets under Florida's Uniform

Trade Secrets Act.[58]  Moreover, in its memorandum in opposition to American Honda's

motion for summary judgment, MIN argues that the remaining counts of its Amended

Counterclaim do not rely on the existence of a trade secret, but rather "rely on

[American] Honda's misrepresentations, inducements, and lies which were told with the

specific intent to cause MIN to forgo other opportunities of funding and further

---

[57] See Doc. 57 at 5-8.

[58] See Doc. 65.

developing its System in order to bring it to market."[59]   As such, Defendants no longer appear to contend that American Honda misappropriated any intellectual property rights.

However, even if they do, there is no record evidence establishing that American Honda misappropriated any intellectual property rights belonging to Defendants.  It is undisputed that the American Honda representatives with whom Schweighart had contact -- i.e., Toyota, Christopher and Keller -- did not share any information received from Schweighart with anyone at American Honda or Honda Research and Development in Japan.[60]   Moreover, American Honda has not marketed any product, nor does it have plans to introduce in the foreseeable future any product that is comprised of all of the elements in MIN's telematics system.[61]   Accordingly, Summary Judgment should be granted in favor of American Honda on its Complaint for Declaratory Judgment.

## B.   MIN's First Amended Counterclaim

Plaintiff argues that it is entitled to Summary Judgment against MIN on the remaining counts of MIN's First Amended Counterclaim -- i.e., Count Two (Deceptive and Unfair Trade Practices), Count Three (Breach of Oral Confidentiality Agreement), Count Five (Fraud) and Count Six (Negligent Misrepresentation).

---

[59] See Doc. 100 at 11.

[60] See Declaration of Wayne Toyota, ¶3; Declaration of Gary Christopher, ¶3; Declaration of Charles Keller, ¶¶7-8; Declaration of William R. Willen, ¶6.

[61] See Schweighart Dep. 871-72; Doc. 83, Exhibit 15 (Declaration of Robert James Gurga), ¶¶3-4.

### (1) Count Two -- Deceptive and Unfair Trade Practices

American Honda contends that is entitled to summary judgment in its favor with regard to MIN's claim under FDUTPA[62] because: (1) prior to July 1, 2001 (the date FDUTPA was amended) FDUPTA was limited to claims by consumers, and not entities like MIN that neither purchased nor used a product or service from American Honda, and  (2) the limited contacts between American Honda and MIN, after July 1, 2001 are insufficient to establish a substantive violation of FDUPTA.

Section 501.211(2) of FDUTPA authorizes a private cause of action for damages. Prior to July 1, 2001, Section 501.211(2) provided:

> In any individual action brought by a *consumer* who has suffered a loss as a result of a violation of this part, such *consumer* may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105 . . . [63]

Section 501.211(2) was amended effective July 1, 2001 and the class of potential claimants was broadened by the substitution of the word "person" for "consumer."[64] Thus, prior to July 1, 2001 only *consumers* could bring an action for violation of FDUTPA, while any "person" could bring a claim after July 1, 2001. Most of the relevant events in this case occurred before July 1, 2001 although some of the

---

[62] American Honda argues that MIN has no standing to assert its FDUTPA claim because MIN relies on §501.2075 (i.e., the section that permits only the "enforcing authority" to bring an action to recover a civil penalty), rather than §501.211 which authorizes a private cause of action for injunctive relief and damages.  MIN contends that this was merely a typographical error.  American Honda also argues that even if MIN had properly alleged a violation of the section that creates a private remedy, MIN cannot recover damages because it failed to plead a claim for declaratory or injunctive relief.  MIN argues that by requesting that American Honda's conduct be deemed to be in violation of FDUTPA it has requested declaratory relief.  The Court will assume without deciding that MIN has properly alleged a private cause of action pursuant to FDUTPA.

[63] §501.211(2), Fla. Stat. (2000)(emphasis added).

[64] See §501.211(2), Fla. Stat. (2003); see also Niles Audio Corp. v. OEM Sys. Co., 174 F.Supp. 2d 1315, 1319-20 (S.D. Fla. 2001)(considering effect of the amendment).

14

alleged events took place after this date. Accordingly, the Court will analyze MIN's claims under the pre and post July 1, 2001 revisions to FDUTPA.

With regard to the events that occurred prior to July 1, 2001, American Honda argues (and MIN does not dispute) that MIN is not a "consumer" within the meaning of the pre-July 1, 2001 statute.  In order to be a "consumer" MIN would have had to purchase or use a commodity or service supplied by American Honda.[65]  MIN did not purchase or use anything from American Honda.  Rather, MIN sought sponsorship or funding from American Honda so that it could develop a mapping program which was needed to finalize its compilation of ideas.[66]  The amendment to FDUTPA cannot be retroactively applied to allow MIN, who is not a consumer, to assert FDUTPA claims that accrued prior to July 1, 2001.[67]  Accordingly, summary judgment should be granted for any FDUTPA claims that accrued prior to July 1, 2001.

With regard to events that occurred after July 1, 2001, MIN had limited contact with American Honda.  On July 5, 2001, Schweighart sent two electronic mail communications to Keller requesting a meeting and discussing his ideas in general terms without disclosing any confidential information.[68]  Schweighart and

---

[65] See Guyana Tel. & Tel. Co. V. Melbourne Int'l Communications, Ltd., 329 F.3d 1241, 1246-47 (11th Cir. 2003); N.G.L. Travel Associates v. Celebrity Cruises, Inc., 764 So.2d 672, 674 & n.3.(Fla. App. Ct. 2000).

[66] See Defendants/Counter-Plaintiffs' Notice of Service and Supplemental Answers to Plaintiff/Counter-Defendant's First Set of Interrogatories, Answer to Interrogatories 19 & 21.

[67] See Guyana Tel. & Tel. Co. v. Melbourne Int'l Communications, Ltd., 329 F.3d 1241, 1247 (11th Cir. 2003)(concluding that the 2001 amendment to §501.211(2) was not intended to be retroactive).

[68] See Doc. 83, Exhibits 9 & 22.

Keller then had brief electronic mail communications to schedule a meeting at the Honda Homecoming.[69]   Schweighart and Keller had a brief meeting (ten or fifteen minutes) in a parking lot at the Honda Homecoming in late July 2001[70] and then a second face to face meeting on October 2, 2001 at American Honda's headquarters in Torrance, California.[71]  This meeting lasted two to two and a half hours.[72] Notably, within a mere three weeks of the October 2, 2001 meeting, American Honda's legal department sent Schweighart a letter expressly advising Schweighart that American Honda did not want to pursue MIN's proposal.[73] Schweighart concedes in his deposition testimony that upon receiving the letter he understood that any relationship he and MIN had with American Honda was over.[74]  Even considering these actions in the light most favorable to MIN, these facts fail to establish a deceptive, misleading or unfair practice within the meaning of FDUTPA.[75]

MIN argues that "[no] company should [ ] be allowed to encourage consumers, or members of the public to engage in research and development in

---

[69] See Doc. 83, Exhibit 9.

[70] See Schweighart Deposition, page 198-201.

[71] See id., page 202.

[72] See id.

[73] See Doc. 83, Exhibit 20; Schweighart Deposition, page 211.

[74] See Schweighart Deposition, page 913.

[75] A "deceptive practice" under FDUTPA is one that is likely to mislead consumers acting reasonably in the same circumstances. See Davis v. Powertel, Inc. 776 So.2d 971, 974 (Fla. App. Ct. 2000). An "unfair practice" under FDUTPA is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. See PNR, Inc. V. Beacon Property Management, Inc., 842 So.2d 773, (Fla. 2003).

order to prevent them from partnering with their competitors or competing directly with them."[76]  However, there is no evidence suggesting that American Honda did anything after July 1, 2001 to prevent MIN from partnering with competitors or competing directly with American Honda.  Accordingly, summary judgment should be granted in favor of American Honda on Count Two of MIN's Amended Counterclaim.

(2)  **Count Three -- Breach of Oral Confidentiality Agreement**

MIN also is entitled to summary judgment in its favor with regard to MIN's claim for breach of oral confidentiality agreement because: (1) there is no evidence of record that American Honda disclosed any information to third parties, or for that matter, did anything whatsoever with the information Schwieghert discussed with the Honda representatives; and (2) to the extent there was any oral agreement MIN's claim for breach of the oral agreement is barred by the Statute of Frauds.

Turning first to whether American Honda breached the oral agreement by disclosing the compilation of ideas to others, MIN alleges in its Amended Counterclaim that American Honda used the compilation of ideas to develop products containing the novel and confidential ideas embodied in MIN's system.[77]  However, other than this bald allegation in the Amended Counterclaim, there is no evidence of record presented by MIN that American Honda disclosed any information to third parties, or for that matter, did anything whatsoever with the

---

[76] Doc. 100 at 13.

[77] Doc. 50, ¶¶ 81, 82.

information Schwieghert discussed with the Honda representatives.[78] It is axiomatic

that in order to prevail on its claim for breach of the alleged oral confidentiality

agreement, MIN must show that American Honda breached the  agreement by

disclosing "confidential" information provided by MIN.[79] American Honda

representatives have submitted sworn testimony that American Honda has not used

or disclosed any information provided by MIN.[80]  Notwithstanding MIN's allegations

in its Amended Counterclaim, MIN has failed to present any evidence to refute

American Honda's sworn declarations. Accordingly, on this ground alone, American

Honda is entitled to summary judgment on MIN's claim for breach of the

confidentiality agreement .

MIN's claim for breach of the oral confidentiality agreement is also subject to

dismissal because it is barred by the Statute of Frauds.  Section 725.01, Florida

Statutes, provides in pertinent part:

> No action shall be brought . . . upon any agreement that is not to be
> performed within the space of 1 year from the making thereof . . . unless
> the agreement . . . upon which such action shall be brought, or some note
> or memorandum thereof shall be in writing and signed by the party to be
> charged therewith . . .

---

[78] Further, as evidenced by the declarations of American Honda's experts, the components or subsets of the telematics system are not unique and have been around and used in various combinations well before 1999. *See, Doc. 83, Exs. 13 & 14.* Therefore, to the extent that Schweighart contends that American Honda uses any of the components of his compilation of ideas, such as a GPS system, such an assertion is not included in the claims in this case. As discussed previously, the technology that forms the subject matter of this case is a "compilation of ideas" and not the components of systems that make up the telematics system Schweighart contends he conceived.

[79] See Doc. 50 at ¶¶ 81-82.

[80] See Declaration of Wayne Toyota, ¶3; Declaration of Gary Christopher, ¶3; Declaration of Charles Keller, ¶¶7-8; Declaration of William R. Willen, ¶6.

Under Florida law, "[t]he primary factor to be utilized in determining whether or not an oral contract is to be performed within the one year limitation of the statute is, of course, the intent of the parties." [81]

It is undisputed that MIN anticipated that its relationship with American Honda would last more than one year.[82]  Nevertheless, MIN argues that the oral confidentiality agreement is outside of the Statute of Frauds because it was capable of performance within one year.  MIN contends that it expected the oral confidentiality agreement to last only until American Honda executed the written confidentiality agreement and that American Honda implied that "the written confidentiality agreement would be executed in a short time."[83]  However, even if American Honda implied that the "written confidentiality agreement would be executed in a short time," it was not.  A contingency that might happen is not sufficient to remove an oral agreement from the Statute of Frauds.[84]

MIN also argues that the oral confidentiality agreement is removed from the statute of frauds by virtue of MIN's full performance of its duties under the agreement.  While full performance may take an oral agreement outside the statute of frauds, MIN misinterprets its promise not to pursue development of the

---

[81] First Realty Inv. Corp. v. Gallaher, 345 So.2d 1088, 1089 (Fla. App. Ct. 1977); see also Khawly v. Reboul, 488 So. 2d 856, 858 (Fla. App. Ct. 1986); Bross v. Wallace, 600 So.2d 1198, 1199 (Fla. App. Ct. 1992); Venditti-Siravo, Inc. v. City of Hollywood, Fla., 418 So.2d 1251, 1253 (Fla. App. Ct. 1982).

[82] See Schweighart Deposition, page 176; see also Doc. 100 at 17.

[83] Doc. 100 at 17.

[84] See First Realty Investment Corp. v. Gallaher, 345 So.2d 1088, 1089 (Fla. App. Ct. 1977)(concluding that contingencies of death, resignation and/or firing do not take oral employment contract for bonus out of control of statute of frauds).

telematics system with other parties (such as Evel Knievel), as full performance.

Assuming there was an oral agreement, MIN's obligation was to develop and

present a usable telematics system to American Honda, and not simply to forego

doing business with other companies. Thus, MIN's assertion that it kept its

bargain not to disclose its concept to other parties was only part of the bargain it

alleges existed between it and American Honda. Accordingly, at best, MIN

performed only part of what it alleges it was obligated to do. The development of

the product with American Honda never took place, which was the material

substance of the alleged oral agreement with American Honda. Therefore, even

assuming that MIN had partly performed part of what it alleges to be the bargain

with American Honda, such performance does not avoid the operation of the

Statute of Frauds because, under Florida law, the doctrine of part performance is

not available in an action at law, as here, solely for damages.[85]

Accordingly, for each of these reasons, summary judgment should be

granted in favor of American Honda as to Count Three of the First Amended

Counterclaim.

---

[85]  See Dwight v. Tobin, 947 F.2d 455, (11th Cir. 1991); Collier v. Brooks, 632 So.2d 149, 152-53 (Fla. App. Ct. 1994); Hospital Corp. of America v. Associates In Adolescent Psychiatry, S.C., 605 So.2d 556, 557-58 (Fla. App. Ct. 1992).  MIN cites two Florida cases for the proposition that full performance by one party takes an agreement outside the statute of frauds. See Rubenstein v. Primedica Healthcare, Inc., 755 So.2d 746, 748 (Fla. App. Ct. 2000); Shaffer v. Ricci, 603 So.2d 566, 568 (Fla. App. Ct. 1992). However, in Dwight v. Tobin, the Eleventh Circuit thoroughly reviewed Florida case law and concluded that Florida law is settled that part performance is an equitable doctrine only and is not available in actions for damages at law. Several Florida courts have agreed with the Eleventh Circuit's conclusion.  See e.g., Collier v. Brooks, 632 So.2d 149, 152-53 (Fla. App. Ct. 1994); Hospital Corp. of America v. Associates In Adolescent Psychiatry, S.C., 605 So.2d 556, 557-58 (Fla. App. Ct. 1992).

### (3)  Counts Five and Six -- Fraud and Negligent Misrepresentation

Because MIN's claims for fraud and negligent misrepresentation are closely related American Honda is entitled to summary judgment in its favor on each of these counts for the same reasons.

To establish fraud, MIN must show (1) a false representation of fact, known by American Honda to be false at the time it was made; (2) the representation was made for the purpose of inducing MIN to act in reliance on it; (3) actual reliance by MIN on the representation; and (4) resulting damage to MIN.[86]  Each of these elements must be proven by clear and convincing evidence.[87]  The elements of the negligent misrepresentation claim are essentially the same, except that, instead of knowledge of the falsity of the representation, MIN need only prove that American Honda reasonably should have known of the statement's falsity.[88]

With respect to both its claim for fraud and negligent misrepresentation, MIN contends that American Honda made false promises to MIN and Schweighart in an attempt to prevent MIN from soliciting third parties for funding and assistance in further developing its telematics system and bringing it to market to compete with American Honda.[89]

---

[86] See e.g., Essex Ins. Co., Inc. v. Universal Entertainment & Skating Center, Inc., 665 So.2d 360, 362-63 (Fla. App. Ct. 1995).

[87] See Biscayne Boulevard Properties, Inc. v. Graham, 65 So.2d 858, 859 (Fla. 1953).

[88] See Rogers v. Cisco Systems, Inc., 268 F.Supp.2d 1305, 1312 (N.D. Fla. 2003); C&J Sapp Pub. Co. v. Tandy Corp., 585 So.2d 290, 292 (Fla. App. Ct. 1991).

[89] See Doc. 100 at 10.

MIN contends that Toyota, Christopher, and Keller misrepresented that American Honda was interested in either participating or entering into some type of business relationship to develop and market MIN's telematics system.[90] According to MIN, American Honda's interest in entering into a business relationship with it is evidenced by the meetings and communication between Schweighart and Toyota, Christopher and Keller.  Even if such representations were made, they do not support a claim for fraud for at least three reasons.  First, American Honda's alleged misrepresentations were too vague and indefinite.[91] Second, at best, the alleged misrepresentations are nothing more than a promise, or an expression of intent, to do something in the future, which is not actionable fraud.[92]  Third, it was not reasonable or justified for MIN to rely on such vague and indefinite representations regarding American Honda's future conduct.[93]

With respect to the meetings with Toyota and Christopher, Schweighart met with them one time at an industry-wide motorcycle conference in October 2000.[94] Schweighart testified that after only a twenty to twenty-five minute conversation, Toyota and Christopher committed to make $7 million available to MIN for

---

[90] See Doc. 50 ¶87(c), ¶94(c); Doc. 100 at 17.

[91] See Connecticut General Life Ins. Co. v. Jones, 764 So.2d 677, 684 (Fla. App. Ct. 2000)(holding that employer's alleged promises to pay worker were so vague that it was not reasonable for defendant to rely upon them); see also Simon v. Celebration Co., 883 So.2d 826, 833 (Fla. App. Ct. 2004)(noting that alleged misrepresentations were too vague to provide the essential foundation for a fraud claim).

[92] See Maunsell v. American General Life and Acc. Ins. Co,, 707 So.2d 916, 917 (Fla. App. Ct. 1998); Sleight v. Sun and Surf Realty, Inc., 410 So.2d 998, 999 (Fla. App. Ct. 1982).

[93] See Connecticut General Life Ins. Co. v. Jones, 764 So.2d 677, 684 (Fla. App. Ct. 2000).

[94] See Defendants/Counter-Plaintiffs' Notice of Service and Supplemental Answers to Plaintiff/Counter-Defendant's First Set of Interrogatories, Answer to Interrogatories 19 & 21.

development of the telematics systems.[95] During that meeting, Schweighart

described the telematics system in general terms and did not discuss the specifics

of the product with enough detail to demonstrate the exact combination of elements

of his proposed system.[96]  Schweighart did not provide Toyota or Christopher with

any written materials (other than the non-disclosure agreement), nor did he

demonstrate his software program.[97]

These discussions are woefully insufficient to support a claim for fraud or

negligent misrepresentation for several reasons. First, assuming that Toyota and

Christopher made this commitment, such a commitment (without any detail as to

whether the funds were to be an investment in equity or a loan, and if so, the terms

of the loan ) was entirely too vague and indefinite to support a claim for fraud.[98]

Second, at most, the alleged commitment was a promise to do something in the

future, which is not actionable fraud.[99]  Finally, it was not reasonable, as a matter of

law, for MIN to rely on a commitment (with no details or specifics) that American

---

[95] See Schweighart Deposition, pages 176-77.

[96] See Defendants/Counter-Plaintiffs' Notice of Service and Supplemental Answers to Plaintiff/Counter-Defendant's First Set of Interrogatories, Answer to Interrogatories 19 & 21.

[97] See Schweighart Deposition, page 164.

[98] See Connecticut General Life Ins. Co. v. Jones, 764 So.2d 677, 684 (Fla. App. Ct. 2000); Simon v. Celebration Co., 883 So.2d 826, 833 (Fla. App. Ct. 2004)

[99] See Maunsell v. American General Life and Acc. Ins. Co,, 707 So.2d 916, 917 (Fla. App. Ct. 1998); Sleight v. Sun and Surf Realty, Inc., 410 So.2d 998, 999 (Fla. App. Ct. 1982).

Honda would provide MIN with $7 million in funding based on Schweighart's brief impromptu conversation with Toyota and Christopher.[100]

With respect to Keller's representations to Schweighart,  Schweighart met with Keller on only four occasions over a twelve month period of time.[101]  The first three meetings occurred at motorcycle events open to the public -- i.e. Biketoberfest, Bike Week and Honda Homecoming.  In the October 2000, meeting at Biketoberfest,  Schweighart gave Keller a document that was "paper collateral for a brochure."[102]  According to Schweighart, it did not contain any confidential, proprietary or privileged information.[103]  Schweighart also gave Keller a CD-ROM containing a "shell application" that "demonstrat[ed] intent" and was not fully functional.[104]  Almost five months later, Schweighart met with Keller at Bike Week.[105]  The meeting lasted for a couple of hours.[106]  Schweighart did not provide Keller with any documents; however, he gave him another copy of a CD-ROM containing another version of the software.[107]  Several months later, Schweighart

---

[100] See Connecticut General Life Ins. Co. v. Jones, 764 So.2d 677, 684 (Fla. App. Ct. 2000).

[101] See Schweighart Deposition, pages 183, 192, 196, 198-89.

[102] See id., pages 101-02, 185.  This document was identified as Exhibit 10 to Schweighart's Deposition.  However, as noted above in footnote 2, the exhibits were not filed with the Court.

[103] See id., page 104.

[104] See id., pages 73-74.

[105] See id., pages 192-93.

[106] See id., page 192.

[107] See id., pages 194-95.  Schweighart testified that he assumed he gave Keller software version 2.0 at this meeting.  See id.  Schweighart believes that version 2.0 had the mapping component disabled. See id., page 458.  There is another version of the software titled "MIN Final."  However, Schweighart did not

(continued…)

met with Keller at the Honda Homecoming.  The meeting lasted ten or fifteen minutes.[108] Schweighart did not provide Keller with any documents and he did not discuss any substantive matters with Keller other than telling Keller what he had learned about wireless networks.[109]

Viewing this evidence in the light most favorable to MIN - which the Court must on a motion for summary judgment - MIN has adduced evidence that shows, at best, that Keller, on behalf of American Honda, affirmatively expressed an interest in the telematics system.  However, this evidence is woefully insufficient to support a claim for fraud.  As discussed above, if Keller made such representations they constituted nothing more than an expression of American Honda's future intentions.[110]   A mere promise to do something in the future is insufficient to establish a basis for fraud.

Additionally, MIN's fraud claim must fail because it was not reasonable, as a matter of law, for Schweighart to rely on indefinite and undefined representations that American Honda was interested in funding his telematics system at the level of

---

[107](…continued)
provide a copy of this final version to Keller.  See id., page 459.

[108] See id., page 201.

[109] See id., pages 198-201.

[110] See Connecticut General Life Ins. Co. v. Jones, 764 So.2d 677, 684 (Fla. App. Ct. 2000); Maunsell v. American General Life and Acc. Ins. Co,, 707 So.2d 916, 917 (Fla. App. Ct. 1998); Sleight v. Sun and Surf Realty, Inc., 410 So.2d 998, 999 (Fla. App. Ct. 1982).

$7 million based on the discussions that occurred at these meetings and based on the limited information provided by MIN to American Honda at these meetings.[111]

Schweighart's final meeting with Keller occurred at Honda Headquarters.[112] Even if Keller had made misrepresentations during the course of that meeting with regard to American Honda's intentions, it is undisputed that Schweighart did not take any actions in reliance on them.

Keller immediately forwarded Schweighart's proposal to American Honda's Legal Office and the Legal Office notified Schweighart within one month that American Honda was not interested in pursuing his proposal.[113]  Schweighart did not present any evidence showing that he took any actions (i.e., further developing his concept) while he waited to hear from American Honda.[114] At best, Schweighart may have delayed one month in pursuing other opportunities. However, once he received the letter one month later from American Honda's legal counsel advising him that American Honda did not want to do business with him, American Honda's position was crystal clear and thus there was nothing to stop Schweighart from shopping his idea to other interested parties.

---

[111] See Connecticut General Life Ins. Co. v. Jones, 764 So.2d 677, 684 (Fla. App. Ct. 2000)(holding that employer's alleged promises to pay worker were so vague that it was not reasonable for defendant to rely upon them); see also Simon v. Celebration Co., 883 So.2d 826, 833 (Fla. App. Ct. 2004)(noting that alleged misrepresentations were too vague to provide the essential foundation for a fraud claim).

[112] See id., page 202.

[113] See Declaration of Charles Keller, ¶7; Declaration of William R. Willen, ¶4.

[114] See id.

Schweighart also testified that he communicated with Keller over the telephone and through email.[115]  However, he did not provide any specific details regarding the frequency of the communications or the content.  While there are copies of a few emails between Schweighart and Keller in the record,[116] Keller did not make any representations regarding American Honda's interest in MIN's telematics system in these emails.

MIN also argues that Toyota, Christopher and Keller falsely represented that American Honda was not in the process of developing, marketing or selling any products or services that were similar to that which was being developed by MIN, and had not, up until that time, incorporated the combination of technical elements under development by MIN.[117] With regard to this contention, there is nothing in the record to suggest that this representation was false.  The record is devoid of any evidence that American Honda has marketed any product, or that it plans to introduce in the foreseeable future any product for motorcycles that is comprised of all of the elements in MIN's telematics system.[118]  Indeed, Schweighart testified that

---

[115] See e.g., Schweighart Deposition, pages 189-90.

[116] See Doc. 83, Exhibits 9 & 22.  There were two additional emails introduced at Schweighart's deposition.  The first was dated April 27, 2001.  See Schweighart Deposition, pages 328-336.  Schweighart testified that he was uncertain whether this email was ever sent to Keller. See id., pages 329-30.  The second email was dated May 23, 2001.  See id., pages 336-369.  Keller did not respond to the email. See id., page 369.

[117] See Doc. 50 ¶87(a), ¶94(a); Doc. 100 at 17.

[118] See Schweighart Deposition, 871-72; Declaration of Robert James Gurga, ¶3-¶4.

"there is no product, as I have already said, that fully utilizes . . . all of my concepts together."[119] Thus, such a representation, even if it was made, was not false.[120]

In the Amended Counterclaim, MIN also alleges that Toyota, Christopher, and Keller misrepresented that American Honda would keep the ideas, concepts and combinations of ideas confidential and not use them without the consent of MIN.[121]  However, as discussed above, it is undisputed that Toyota, Christopher and Keller did not share or disclose any information given to them by Schweighart with anyone else at American Honda or Honda Research and Development in Japan.[122]  Accordingly, even if Toyota, Christopher or Keller did agree to keep the information confidential, there is no evidence that this information was shared with anyone else and, thus, MIN cannot establish that this was a false representation.

---

[119] See Schweighart Deposition, page 872. Although In response to interrogatories, MIN identified several American Honda services or products that "incorporate or combine" all of the elements of the compilation of ideas -- i.e., Software V2.05, Inter Navi Premium and VICS, Flexcar, Perfect Drive and/or Random Road Trips, and Ownerlink -- there was no evidence submitted by MIN to support this assertion. See Defendants/Counter-Plaintiffs' Notice of Service and Supplemental Answers to Plaintiff/Counter-Defendant's First Set of Interrogatories, Answer to Interrogatories 8 & 9.  To the contrary, the undisputed evidence of record shows that the products and services identified by MIN do not combine all of the elements of the compilation of ideas.  See American Honda Motor Co., Inc.'s Objections and Responses to Defendants' First Set Of Interrogatories, Answer to Interrogatories 2-22; Declaration of Robert James Gurga, ¶6;  Dana Report, page 42.

[120] MIN also alleges in the First Amended Counterclaim that Toyota, Christopher and Keller falsely represented that American Honda "was interested in MIN's confidential information, and System, when they were, in fact, in the process of developing a product or similar products which would utilize elements or combinations of elements that were incorporated in, or comprised MIN's System."  Doc. 50 ¶87(b), ¶94(b). This alleged misrepresentation overlaps the previously discussed misrepresentations -- i.e., that American Honda was interested in working with MIN and that American Honda was not developing a similar product. Accordingly, for the reasons discussed above, this alleged misrepresentation is likewise not actionable as fraud.

[121] See Doc. 50 ¶87(d), ¶94(d).

[122] See Declaration of Wayne Toyota, ¶3; Declaration of Gary Christopher, ¶3; Declaration of Charles Keller, ¶¶7-8; Declaration of William R. Willen, ¶6.

Lastly, even though MIN has not sued for American Honda's failure to do business with it, it has indirectly alleged in its claims for fraud and negligent misrepresentation that American Honda is liable for failing to go forward with its ideas and concepts. However, under Florida law, a suit for breach of an oral contract cannot be converted into a claim for fraud in order to get around the statute of frauds.[123]  Here, MIN's claims for fraud and negligent misrepresentation are based upon American Honda's alleged failure to fulfill or intention not to fulfill the promises MIN alleges were made by representatives of Honda.[124]  As discussed above, it is undisputed that MIN anticipated that its relationship with American Honda in developing and marketing the telematics system would last well beyond one year.[125]  Accordingly, to the extent that MIN's claims for fraud and negligent misrepresentation are directed at American Honda's failure to go forward and do business with MIN, these claims must also fail as disguised arguments to avoid the statute of frauds.

Thus, for the reasons discussed above, summary judgment is due to be granted in favor of American Honda as to Counts Five and Count Six of MIN's First Amended Counterclaim.[126]

---

[123] See Canell v. Arcola Housing Corp., 65 So.2d 849, 851 (Fla. 1953); Khawly v. Reboul, 488 So. 2d 856, 857 n.1 (Fla. App. Ct. 1986); Ostman v. Lawn, 305 So.2d 871, 872-73 (Fla. App. Ct. 1974).

[124] See Doc. 50, ¶¶ 87 & 94.

[125] See Schweighart Deposition, page 176; see also Doc. 100 at 17.

[126] American Honda also argues that summary judgment should be granted as to all remaining counts of the Amended Counterclaim because MIN has suffered no provable damages as a result of American Honda's actions.  Although the Court has not discussed these arguments - because each of Schweighart's theories and claims of liability are woefully deficient - assuming arguendo that MIN could

(continued…)

## IV.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that American

Honda Motor Co., Inc.'s Dispositive Motion For Summary Judgment (Doc. 78)

should be **GRANTED**.[127]

**IN CHAMBERS** in Ocala, Florida, on October 13, 2005.

GARY R. JONES
United States Magistrate Judge

Copies to:
    The Honorable Wm. Terrell Hodges
    Senior United States District Judge

    Counsel of Record

---

[126](...continued)
support its claims on liability, American Honda would still be entitled to summary judgment in its favor with regard to these arguments for at least three separate reasons. First, MIN has not established that its telematics system has any value. Secondly, because there is no evidence that American Honda has used the telematics system MIN cannot claim that is has been damaged. Lastly, to the extent MIN claims damages of $7 million this claim fails because whether the $7 million of funding from the Knievel organization  is viewed as either a loan or an investment in equity the loss of the funding of the $7 million cannot be the basis of a claim for damages. The damages, if any, suffered by MIN for not selling its telematics system would be the loss of MIN's profits, an issue that MIN has failed to present any evidence to support and an issue on which MIN has not presented any expert testimony.

[127] American Honda has filed a motion to strike portions of Defendants' Response to Plaintiff's Motion For Summary Judgment and Supporting Appendix. (Doc. 102.)  Defendants only recently filed a response. (Doc. 105.)  American Honda seeks to strike, Defendants' assertion that Count Two (FDUTPA) of MIN's First Amended Counterclaim contains a request for declaratory relief.  Additionally, American Honda moves to strike a portion of the Declaration of Gregory Schweighart as hearsay.   Because striking the challenged portions of the response and appendix would have no bearing on the disposition of summary judgment, American Honda Motor Co., Inc.'s Motion And Incorporated Supporting Memorandum of Law To Strike Portions Of Motorcycle Information Network, Inc. And Gregory Schweighart's Response To Plaintiff's Motion For Summary Judgment (Doc. 100) And Supporting Appendix (Doc. 101) is due to be **DENIED**.